AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

_____ DISTRICT OF MASSACHUSETTS _____

UNITED STATES OF AMERICA

V.

GUILLERMO FREDERICO VASCO

### CRIMINAL COMPLAINT

CASE NUMBER: $O5 - m_1 - OOOOC - LTS$

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my

knowledge and belief. On or about _____ April 1 to May 17, 2005 _____ in _____ Essex _____ county, in the

_____ District of _____ Massachusetts _____ defendant(s) did, (Track Statutory Language of Offense)

use the mail and a facility of interstate commerce with intent that a murder be committed in violation of the laws of the Commonwealth of Massachusetts and as consideration for the receipt of, and promise and agreement to pay, money and other items of pecuniary value

in violation of Title _____ 18 _____ United States Code, Section(s) _____ 1958(a) _____ .

I further state that I am a(n) _____ ATF Special Agent _____ and that this complaint is based on the following
                                        Official Title

facts:

See attached affidavit of Matthew O'Shaughnessy

Continued on the attached sheet and made a part hereof:     ☒ Yes     ☐ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

06-03-2005                                              at     _Boston, MA_
Date                                                              City and State

LEO T. SOROKIN
UNITED STATES MAGISTRATE JUDGE

Name & Title of Judicial Officer                          Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

VASCO states, among other things:

> I've heard that our friends and their doggy Nickie
> will take a trip down there, Ah? That would be great
> if you could help them.  But Nickie is very old and
> sick.  She won't survive such trip ... the only
> thing would be to put Nickie to sleep ... I knwow
> (sic) . . . Sad but true . . . Like our favorite
> Metallica song . . . Ja . .? She was soo (sic) loyal
> and obidient (sic).  Anyways if so can she be buried
> outside of Mass. . ?  Making sure that Nickie will
> be 10 feet down and do not forget the cement thing.
> Also I'd like to know if Candy would be able to see
> the family if not she must stay with Nickie down
> there . . .

10.  Following receipt of the letter, at ATF's direction,
the CW told VASCO that the hit man "Mike" would be coming to
see him at the ECCF and would gain entry by posing as an
attorney (the CW told VASCO that "Mike" had a bar card).

11.  On April 26, 2005, ATF Special Agent Croke, posing
as "Mike," met with VASCO at the ECCF.  Only one ECCF
investigator was told of the investigation beforehand and of
Special Agent Croke's true identity and status.  Special Agent
Croke was wearing a concealed audio recorder and a separate
concealed video recorder.  The meeting took place in an
inmate/attorney meeting room.  A description of significant
aspects of the meeting follows.

a.  "Mike" stated that he had received VASCO's
letter but had some questions about it.  VASCO pulled a copy
of it from his file, stated that he was "so worried about

6

sending the letter," and read significant portions of it
aloud.  It is the same letter as that attached to this
affidavit as Exhibit 1.

        b.  When "Mike" asked who Nickie is, VASCO said, "my
wife."  He also repeatedly confirmed that he wanted the body
buried outside of Massachusetts "because in the future, I
don't want somebody to come find her."  He also confirmed that
the cement was important to keep the body down and that it
should be buried ten feet down.      .

        c.  VASCO displayed pictures of his daughter and
said, "This is the puppy."  He further stated that the "puppy"
should go to Canada, and from there to his mother in Ecuador.

        d.  "Mike" showed VASCO photographs of VASCO's
wife's house and car, stating that he had been surveilling the
premises.  VASCO looked at pictures and described for "Mike"
how best to get into the house.  VASCO said he did not want
anything done to his in-laws.

        e.  "Mike" described another method of disposing of
a body which would cause it to ultimately disappear.  He
stated that the body could be put into an oil drum, which
would be drilled with holes and filled with cement, and then
dropped into the ocean.  In that way, "Mike" stated, the
corpse would eventually be eaten.  VASCO stated, "I think I

7

like that idea" and added that he thought that was the "best way."

f.   "Mike" told VASCO that the cost of killing VASCO's wife would be $10,000 and that kidnaping the daughter and getting her to Ecuador would cost another $10,000.   VASCO stated that he was "trying to save family," and then asked "how much" if his daughter was not included.   VASCO agreed to pay in periodic installments in addition to providing a money collection he owned that he said was worth $10,000.   VASCO stated that his attorney had custody of the money collection. "Mike" and VASCO agreed that "Mike" would have someone pick the collection up from VASCO's lawyer.

12.   On April 28, 2005, Special Agent Croke, posing as "Mike," spoke by telephone to VASCO.   The call was recorded by the ECCF, as well as by ATF.   In the call, "Mike" and VASCO further refined the arrangements to have a friend of "Mike" pick up the money collection from VASCO's lawyer.   During the conversation, "Mike" asked VASCO if he still wanted to go forward with the "construction project," which was another code for the plan to murder VASCO's wife.   VASCO replied, "Just go ahead.   Absolutely.   Green light."

13.   On April 29, 2005, ATF Special Agent Stephanie Schafer, acting in an undercover capacity as a friend of

"Mike" named "Stephany Bears," met with VASCO's attorney at
the attorney's law office. "Stephany" obtained an envelope
filled with 59 different paper currencies from assorted
countries and two cardboard sheets with assorted coins from
different countries taped to the sheets, as described by VASCO
in his meeting with Special Agent Croke.

14. After ATF received the money collection, Special
Agent Croke, posing as "Mike," spoke to VASCO again by
telephone. In the recorded conversation, "Mike" stated that
the money collection that "Stephany" had picked up was "a
little light," meaning that the collection would not be
sufficient to pay for the proposed killing. "Mike" stated
that he needed some cash to cover operating expenses. VASCO
then stated that his attorney had $400 of his money, which he
would have his attorney give to "Stephany." It was then
agreed that "Stephany" would return to the lawyer's office to
pick up that money.

15. On May 3, 2005, Special Agent Schafer, posing as
"Stephany Bears," returned to VASCO's attorney's office and
was given a check payable to "Stephany Bears" in the amount of
$200. The attorney told her that he had prepared the check at
VASCO's direction. The attorney also stated that VASCO's
brother had originally wired $480 on behalf of his brother,

9

but he explained that some of that money had gone for other fees, including $100 for VASCO's canteen fund and approximately $150 to reimburse the attorney for money he spent taking collect calls from VASCO and making conference calls to Ecuador.

16. On May 10, 2005, I and others met with VASCO's wife to advise her of ATF's investigation regarding VASCO's efforts to hire someone to kill her. I asked her if she would agree to assist in the investigation by posing for photographs of her supposed murder by the hit man, which photographs would then be shown to VASCO. She agreed. The following day, a makeup artist made up VASCO's wife so that it appeared as if she had been beaten and shot in the head with a small caliber handgun. She then posed lying on the ground, still and unmoving, with eyes closed, in a wooded area adjacent to a body of water and next to a fifty-gallon oil drum. I took a number of digital photographs of her from different angles and distances.

17. On May 16, 2005, Special Agent Croke, posing as "Mike," had another recorded telephone call with VASCO. "Mike" stated that the construction project was in its final stages. VASCO replied, "No pain, no gain." They agreed that "Mike" would come see him the next day to discuss the project

10

in person, rather than on the telephone.

18. On May 17, 2005, Special Agent Croke, posing as "Mike," returned to the ECCF to meet with VASCO. He was again wearing concealed audio and video recorders and the meeting took place in an inmate/attorney meeting room. A description of significant aspects of the meeting follows.

a. VASCO stated that he would be requesting a speedy trial in his pending case once his wife was killed. He and "Mike" then discussed how his case would be dismissed once the key witness was unable to testify.

b. "Mike" raised the issue of payment again, stating (without resort to code) that the cost of killing VASCO's wife and kidnaping his daughter would be $20,000. VASCO stated that after he had been released from jail, it would take him a month to make his first payment and that it would take six months to pay off the remaining balance.

c. While continuing to discuss the arrangements, VASCO stated, " I would like, you know, to take care of my business by my own hands, but I'm here. What can I do?"

d. VASCO asked "Mike" if he still planned on using a barrel to dispose of his wife's body in the ocean. At that point, "Mike" told VASCO that the murder had been committed the night before and that VASCO's daughter was currently with

11

"Stephany," who was "laying low." "Mike" stated that he had

put VASCO's wife's body in a fifty-gallon oil drum, drilled

holes in it, filled it with rocks and dried cement, and dumped

it from a boat off the coast of Maine. He further stated that

VASCO's wife had fought ferociously before the murder and was

bigger and stronger than he had thought. He told VASCO that

just before her death, he ("Mike") told her that this was

being done "for Guillermo." During the description of the

murder, VASCO was smiling.

        e.   "Mike" then produced copies of three of the

photographs for which VASCO's wife had posed and showed them

to VASCO.  VASCO pointed at one and asked about the black hole

on VASCO's wife's forehead.  "Mike" explained that it was a

.22 caliber bullet hole.  When VASCO subsequently expressed

concern that copies of the photographs might be found, "Mike"

assured him that he had shredded the printer cartridge and the

disk containing the photographs and would destroy all the

copies.

        f.   There was extended discussion about the

arrangements for "Stephany" to travel to Ecuador to deliver

VASCO's daughter to his mother.  "Mike" stated that she would

likely be delivered on the following Saturday or Sunday (i.e.,

May 21 or 22, 2005).  VASCO said that his mother would meet

12

his daughter at the airport in Quito and that she would be holding a sign reading, "Julia." He provided "Mike" with a photograph of his mother. He subsequently wrote out a note in Spanish and asked "Mike" to call his mother and read the note to her. The purpose of the note was to advise VASCO's mother of the daughter's probable arrival in Ecuador on May 22, 2005.

g. At the conclusion of the meeting, "Mike" stated, "So this is a good day for you. Everything is moving forward." VASCO replied, "Yeah. Finally, it's the final stage and you did a good job. I just wish I could see that, I mean be there." When "Mike" then said, "I made sure she realized it was from you," VASCO said, "Thank you. I appreciate it. And you have my friendship, my loyalty, my respect."

17. Based on the foregoing, there is probable cause to believe that Guillermo Frederico VASCO used the mail and a facility of interstate commerce with intent that a murder be committed in violation of the laws of the Commonwealth of Massachusetts and as consideration for the receipt of, and promise and agreement to pay, money and other items of

pecuniary value, in violation of 18 U.S.C. § 1958(a).

MATTHEW O'SHAUGHNESSY
Special Agent
Bureau of Alcohol, Tobacco
Firearms and Explosives


Subscribed and sworn to before me on this third day of June, 2005

LEO T. SOROKIN
UNITED STATES MAGISTRATE JUDGE

14

EXHIBIT 1

Hi HONNEY...

How You Guys Doing?

Thank You For senden those pictures of home.

I'm dieyieng to see our family in Uuungpandang.

Glad to see our parents together. I have to tell u

that everything is ok uzhere. It is spring and

the blossoms are drifting off. This time I'll pick up

the Right flower ... I've heard that our friends and

their dady Nickie will take a trip down there HH?

that would be great if you could help them. But

Nickie is very old and sick. She wont survive

such trip. The only thing would be to put Nickie

to sleep ... I know... Sad but true --- like

our favorite Metallica songs. Ia, A she was

so loyal and obidienk. Anyways if so can she

be buried out side of mass? Making sure that

Nickie will be 10 feet down and you not forget if

the cemetmx thing. Also I'd like to know if

Candy would be able to see the family down there ...

She must stay with Nickie down there...

Oh... will be the carr recycleable...?

Luisa there is a better choice. Will be much

More Nickie's ... I promEs ya ... ok

In the other hand I'll send ya the monky

collection that I mentioned. Remember

that it's value mark them five thousand.

Dollares but you can keep it for one.

Ok...? Anyway I'm slaving you this beautiful

flower that needs some color ...

You help me out. It needs some color ...

To not worry about me. I'm not going to do ok

to say anything stupid. You got my word, friendship

And love for ever ... ok. 9 right now down here Again..

Suddinly and I do not wanna miss the bus again..

Always say Hi to the family and be very

cautious with your stupics ur ever

YOURS FRULLY

**JS 45  (5/97) - (Revised USAO MA 6/29/0**

**Criminal Case Cover Sheet** _____ **U.S. District Court - District of Massachusetts**

**Place of Offense:** _____ **Category No.** _II_____ **Investigating Agency** _ATF_____

**City** _Middleton_____ **Related Case Information:**

**County**  _Essex_____  Superseding Ind./ Inf. _____   Case No. _____
Same Defendant _____   New _____   X _____
Magistrate Judge Case Number _____
Search Warrant Case Number _____
R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name  _Guillermo Frederico Vasco_____   Juvenile   [ ] Yes   [X] No

Alias Name _____

Address   _Essex County Correctional Facility_____

Birth date (Year only):  _1975_  SSN (last 4 #): _____ Sex _M_ Race: _H_____ Nationality: _Ecuadoran_____

**Defense Counsel if known:** _____   **Address:** _____
_____

**Bar Number:** _____

**U.S. Attorney Information:**

AUSA  _James Lang_____   **Bar Number if applicable** _____

**Interpreter:** [ ] Yes [X] No   **List language and/or dialect:** _____

**Matter to be SEALED:** [ ] Yes  [X] No

[ ] **Warrant Requested**   [ ] **Regular Process**   [X] **In Custody**

**Location Status:**

**Arrest Date:** _____

[ ] **Already in Federal Custody as** _____ in _____ .
[X] **Already in State Custody** _Essex Cty. Cor. Facility_  [ ] **Serving Sentence** [X] **Awaiting Trial**
[ ] **On Pretrial Release:  Ordered by** _____ on _____

**Charging Document:**   [x] **Complaint**   [ ] **Information**   [ ] **Indictment**

**Total # of Counts:**   [ ] **Petty** _____   [ ] **Misdemeanor** _____   [X] **Felony**  _1_____

Continue on Page 2 for Entry of U.S.C. Citations

[X]   I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are
accurately set forth above.

**Date:** _June 3, 2005_           **Signature of AUSA:** _____

JS 45 (5/97) - (Revised USAO MA 3/25/02) Page 2 of 2 or Reverse

**District Court Case Number (To be filled in by deputy clerk):** _____

**Name of Defendant**    Guillermo Frederico Vasco

## U.S.C. Citations

| Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|
| Set 1  18 U.S.C. § 1958(a) | Use of Mail to Solicit Murder | 1 |
| Set 2 | | |
| Set 3 | | |
| Set 4 | | |
| Set 5 | | |
| Set 6 | | |
| Set 7 | | |
| Set 8 | | |
| Set 9 | | |
| Set | | |
| Set | | |
| Set | | |
| Set | | |
| Set | | |
| Set | | |

**ADDITIONAL INFORMATION:**

## **AFFIDAVIT OF MATTHEW O'SHAUGHNESSY**

I, Matthew O'Shaughnessy, being duly sworn, state:

1. I am a Special Agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") in Boston, Massachusetts and have been so employed for more than five and a half years. This affidavit is submitted in support of a criminal complaint charging Guillermo Frederico VASCO (DOB: 2/1/75) with using the mail and telephone to solicit the commission of a murder, in violation of 18 U.S.C. § 1958.

2. This affidavit is based on my personal knowledge, information provided to me by other ATF agents and law enforcement officers, as well as information provided to me by a cooperating witness ("CW"). This affidavit is not intended to set forth all of the information that I and other law enforcement personnel have learned during this investigation, but rather consists of that information necessary to provide the requisite probable cause.

3. VASCO is currently incarcerated as a pretrial detainee at the Essex County Correctional Facility ("ECCF") in Middleton, Massachusetts. He is awaiting trial in connection with a pending case in Salem Superior Court, in which he is charged with aggravated kidnaping, aggravated rape, and home invasion. The victim of the alleged offenses is his estranged

1

wife. VASCO, who is a citizen and national of Ecuador, has been in custody at the ECCF for nearly a year.

4. The CW is also a pretrial detainee at the ECCF. He is the subject of a pending case in United States District Court in which he is charged with conspiracy to distribute a controlled substance. He has a lengthy record of prior convictions for various criminal offenses, including assaults, larceny, breaking and entering, and drug offenses. For his cooperation in the instant investigation, the CW hopes to obtain a more lenient sentence in his pending federal case.

5. On March 22, 2005, I interviewed the CW at the ECCF. At that time, he provided the following information to me.

a. In the first week of February 2005, while VASCO was discussing his pending criminal case with the CW, VASCO asked if the CW knew anyone who would be willing to kill VASCO's wife for money. The CW responded that he knew people who would do it.

b. Over the next couple of weeks, VASCO became increasingly adamant about wanting to have his wife murdered. The CW told VASCO that he should make a definite decision about whether he wanted his wife murdered or not and then he (the CW) would contact his friends.

c. During the course of their conversations, VASCO

2

initially stated that he wanted his wife to totally disappear,
and he asked about having her burned. The CW told him that he
did not think that could be accomplished because his friends
did not have access to an incinerator. VASCO emphasized that
he did not want his wife's body to be found by turning up on
the shore of a lake or ocean or by being found by a jogger in
the woods. The CW stated that his friends were experienced
and would bury his wife in a six-foot hole. VASCO responded
that they would have to bury his wife at least five or six
meters deep and cover her with concrete before filling in the
hole with dirt. He also stated that money should be taken
from her bank account and that her car should be made to
disappear, so that it would appear as if his wife had gone on
vacation. VASCO also stated that he wanted the CW's friends
to kidnap VASCO's young daughter and take her to other family
members outside of the United States.

     d.   The day after VASCO attended a "separation
hearing" in court on March 9 or 10, 2005, VASCO told the CW
that his mind was made up and the CW should call his friends
to arrange for the murder. VASCO also said that if the CW's
friends could not kidnap VASCO's daughter and deliver her to
VASCO's mother in Ecuador, his daughter "should suffer the
same fate" as his wife.

3

6. Following my interview of the CW on March 22, 2005, an investigative strategy was developed by ATF. It called for the CW to introduce VASCO to ATF Special Agent Kenneth Croke, posing as a hit man friend of the CW named "Mike." Pursuant to the plan, the CW was to first tell VASCO about "Mike," stating that he lived in Portland, Maine. The CW was to direct VASCO to send a letter to "Mike's" supposed post office box in Portland, which was in fact the address of an ATF undercover post office box, telling "Mike" what he wanted to have done.

7. In late March 2005, I communicated those instructions to the CW. He subsequently advised me that he had spoken to VASCO about "Mike" and had provided him with "Mike's" Portland post office box address. The CW related to me that VASCO had given him several handwritten pages of notes containing information about VASCO's wife and her family members and friends, as well as hand-drawn maps of the basement and first-floor of her house and photographs of its exterior. The CW sent those documents to ATF, which are further itemized and described as follows:

a. one handwritten page bearing VASCO's wife's name, address, social security number, date of birth, home and cell telephone numbers, two possible work addresses, and a

4

description of her car and its license and VIN numbers;

b. one handwritten page providing names, addresses, and descriptive information about VASCO's wife's parents, siblings, and two best friends;

c. one hand-drawn floor plan of the first-floor of VASCO's wife's house, showing the location of the front and back doors;

d. one hand-drawn floor plan of the basement of VASCO's wife's house, showing the location of an exterior door; and

e. one photocopy of two photographs of the exterior of VASCO's wife's house.

8. The CW also advised me that he and VASCO had devised a code for speaking about the prospective murder of VASCO's wife. She would be referred to as a dog named Nickie and her daughter was to be referred to as Nickie's puppy named Candy.

9. The CW subsequently informed me that VASCO had written a letter that he was going to send to "Mike" at the post office box in Portland, Maine, and that he had showed the letter to the CW. On April 7, 2005, ATF received the letter at the undercover post office box in Portland. A copy of the letter is attached to this affidavit as Exhibit 1. In it,